**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

MICHAEL HUGH COUGHLIN
CLAIRE DOUGHERTY COUGHLIN

        Debtors

UNION PLANTERS BANK
NATIONAL ASSOCIATION

        Plaintiff

    v.

MICHAEL HUGH COUGHLIN

        Defendant

Case No. 04-36413

Adv. Proc. No. 05-3030

**M E M O R A N D U M**

**APPEARANCES:**    WINCHESTER, SELLERS, FOSTER & STEELE, P.C.
                         Walter N. Winchester, Esq.
                         Joshua R. Holden, Esq.
                         Post Office Box 2428
                         Knoxville, Tennessee 37901-2428
                         Attorneys for Plaintiff

                      JOHN P. NEWTON, JR., ESQ.
                         Post Office Box 2069
                         Knoxville, Tennessee 37901
                         Attorney for Defendant/Debtor

**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the Plaintiff, Union Planters Bank National Association,[1] on February 24, 2005, seeking a judgment against the Defendant/Debtor in the amount of $82,319.75 plus costs, interest, attorneys' fees, and expenses, along with a determination of nondischargeability under 11 U.S.C.A. § 523(a)(2)(B) (West 2004).

The trial was held on December 12, 2005. The record before the court consists of twenty-nine exhibits introduced into evidence, along with the testimony of four witnesses, Donna Warrington, Donny R. Johnson, Robert P. Jones, and the Debtor.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(I) (West 1993).

**I**

On November 7, 2002, the Debtor and Robert P. Jones formed Venture Capital Resources, LLC (Venture Capital) to serve as the management company for another company formed by the Debtor and Mr. Jones, Retail Management, LLC. (Retail Management).[2] Retail Management was created in order to operate Wynn's Sports and Outdoors, a branch of the Wynn, Inc. sporting goods store. On December 23, 2002, Venture Capital entered into a Lease with Ramco Properties Associates Limited Partnership (Ramco) for a 35,000 square feet storefront located at 6741 Clinton Highway, Knoxville, Tennessee, in the Northwest Crossing Shopping Center (Clinton Highway Store). TRIAL EX. 8. On that same date, Venture Capital entered into a sublease agreement with Retail Management, beginning in March 2003, for $23,000.00 per month, representing the rent in

---

[1] Union Planters Bank has since merged with Regions Bank.

[2] The Debtor was one-half owner and Chief Manager of Venture Capital, and he was one-half owner and Secretary of Retail Management.

the amount of $21,058.33 per month due to Ramco, plus a management fee. TRIAL EX. 9. During this time, the Debtor was President of Wynn, Inc., operating its offices in Alcoa, Tennessee, and assisting its owner during the company's Chapter 11 bankruptcy case,[3] so Mr. Jones took primary responsibility for the day-to-day operations of the Clinton Highway Store.

In the summer of 2003, the Debtor and Mr. Jones met with Donny R. Johnson, a Vice President of the Plaintiff in its Commercial Lending Department, in an effort to obtain a loan for Retail Management in the amount of $350,000.00 to allow it to purchase inventory for the Clinton Highway Store and to assist with its payables. Mr. Johnson asked for and was provided both business and personal financial statements from the Debtor and Mr. Jones, including the following financial documents submitted by Retail Management: (1) the Income Statement for the Five Months Ending May 31, 2003; (2) the Balance Sheet dated May 31, 2003; (3) the Income Statement for the Six Months Ending June 30, 2003; and (4) the Assumptions Used as Basis for Forecast dated May 31, 2003 (collectively Financial Documentation). TRIAL EX. 12; TRIAL EX. 13; TRIAL EX. 14; TRIAL EX. 20.

Mr. Johnson commenced the loan application process by loading the information from Retail Management's Financial Documentation into the Plaintiff's computer system. Based upon the documents and figures provided, the Plaintiff internally declined Retail Management's loan application; however, the Plaintiff advised the Debtor and Mr. Jones that it would make the loan provided Retail Management obtained a guarantee from the Small Business Administration (SBA),

---

[3] Wynn, Inc. filed a voluntary Chapter 11 bankruptcy case on February 14, 2003. It was converted to Chapter 7 on June 16, 2004, and its assets were subsequently liquidated by the Chapter 7 trustee.

which routinely assists start-up businesses that had been operating for less than three years. Pursuant to this request, Retail Management, through the Debtor and Mr. Jones, supplied Mr. Johnson with additional documentation, and Mr. Johnson, in turn, forwarded the documents to the SBA.

The SBA approved the Plaintiff's application for an SBA guarantee of 75% of the loan amount pursuant to the U.S. Small Business Administration Authorization (SBA 7(a) Guaranteed Loan) dated October 20, 2003. TRIAL EX. 1. Thereafter, on November 14, 2003, the Debtor, in his capacity as Secretary of Retail Management, executed and delivered to the Plaintiff a U.S. Small Business Administration Note (Note) in the amount of $350,000.00. TRIAL EX. 3. The Note was accompanied by the following documents executed on November 14, 2003: (1) a United States Small Business Administration Unconditional Guarantee (Guarantee) executed by the Debtor, Claire D. Coughlin, Mr. Jones, and Anne K. Jones; (2) a Loan Agreement guaranteeing the Note executed by the Debtor, Mrs. Coughlin, Mr. Jones, and Mrs. Jones; (3) a Security Agreement between the Plaintiff and Retail Management; (4) a UCC-1 Financing Statement covering all inventory, accounts, rights, intangibles, instruments, goods, chattel papers, furniture, fixtures, machinery, proceeds, and property of Retail Management; and (5) a Deed of Trust and Security Agreement executed by the Debtor and Mrs. Coughlin, pledging as collateral real property known as Lot 8, Cavert's Station Subdivision, Knoxville, Knox County, Tennessee.[4] TRIAL EX. 4; TRIAL EX. 5; TRIAL EX. 6; TRIAL EX. 7; TRIAL EX. 10. The Debtor and Mr. Jones also executed a Limited

---

[4] On March 12, 2004, the Debtor and Mrs. Coughlin executed a Deed of Trust and Security Agreement, substituting as collateral for the Note their newly purchased residence located at Lot 9, Block U, Village Green Subdivision, Unit 11, Knoxville, Tennessee. TRIAL EX. 11.

Liability Company Authorization and Certificate outlining the parties' business relationship. TRIAL EX. 2.

In May 2004, the Debtor and Mr. Jones contacted Mr. Johnson and informed him that they were attempting to find an investor, but their company was having difficulty paying its bills. At that point, Mr. Johnson turned over Retail Management's account to Donna Warrington, Vice President of the Plaintiff's Special Assets Division. In early June 2004, the Plaintiff, through Ms. Warrington, and Retail Management originally reached an agreement that Retail Management would be allowed to self-liquidate; however, the Plaintiff subsequently received notice that Ramco had filed a Detainer Warrant against Venture Capital on May 18, 2004, and obtained a judgment on June 8, 2004, for possession of the Clinton Highway Store and in the amount of $345,171.40. TRIAL EX. 22.

The Plaintiff then entered into an arrangement with Ramco whereby it paid $20,000.00 and leased the Clinton Highway Store until July 16, 2004, so that it could take an inventory and remove its collateral from the premises. *See* TRIAL EX. 27. Thereafter, Ms. Warrington, her supervisor, and two representatives from Furrow Auction Company conducted a physical inventory of the Clinton Highway Store, compiling a complete inventory list to be combined with the Inventory Value Summary provided by Retail Management on June 22, 2004. *See* COLL. TRIAL EX. 29. Additionally, the Debtor, Mrs. Coughlin, Mr. Jones, and Mrs. Jones executed an Acknowledgment of Default, Voluntary Surrender of Collateral, Agreement to Assist in Sale of Collateral and Waiver on June 22, 2004, and pursuant thereto, the Plaintiff foreclosed upon, sold, and otherwise disposed of all of the assets, inventory, real property, and other collateral securing the Note. *See* TRIAL EX.

26; TRIAL EX. 28. As of the date of trial, the outstanding deficiency balance on the Note was $82,319.75.

The Debtor filed the Voluntary Petition commencing his Chapter 7 bankruptcy case on December 9, 2004, and the Plaintiff timely filed the Complaint initiating this adversary proceeding on February 24, 2005. In its Complaint, the Plaintiff urges the court to find that the deficiency balance is nondischargeable because the Debtor obtained the loan from the Plaintiff fraudulently by providing it with false financial statements respecting his financial condition and that of Venture Capital and Retail Management. The Plaintiff argues that, as a result of the Debtor's fraud, it has incurred losses in the outstanding amount of $82,319.75 plus costs, interest, attorneys' fees, and expenses, for which it seeks a judgment and a determination of nondischargeability. On June 7, 2005, the Debtor filed his Answer, denying the Plaintiff's allegations of fraud and seeking dismissal of the adversary proceeding.

## II

The nondischargeability of debts is governed by 11 U.S.C.A. § 523, which provides, in material part:

> (a) A discharge under section 727[5] . . . of this title does not discharge an individual debtor from any debt—
>
> . . . .

---

[5] Chapter 7 debtors receive a discharge of pre-petition debts, "[e]xcept as provided in section 523 of this title[.]" 11 U.S.C.A. § 727(b) (West 2004). This accomplishes the goals of Chapter 7 to relieve "honest but unfortunate" debtors of their debts and allow them a "fresh start" through this discharge. *In re Krohn*, 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt*, 54 S.Ct. 695, 699 (1934)). The Debtor received a discharge on October 6, 2005.

>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
>> . . . .
>
>> (B) use of a statement in writing—
>
>>> (i) that is materially false;
>
>>> (ii) respecting the debtor's or an insider's financial condition;
>
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
>>> (iv) that the debtor caused to be made or published with intent to deceive[.]
>
> . . . .
>
> (c)(1) Except as provided . . ., the debtor shall be discharged from a debt of a kind specified in paragraph (2) . . . of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2) . . ., as the case may be, of subsection (a) of this section.

11 U.S.C.A. § 523 (West 2004). The party seeking a determination of nondischargeability bears the burden of proving each of the above elements by a preponderance of the evidence, *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991), and § 523(a) is construed strictly against the Plaintiff and liberally in favor of the Debtor. *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998); *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003). Additionally, the bankruptcy court possesses both the jurisdiction and authority to adjudicate the Plaintiff's claims and award any necessary judgment. *See Copeland*, 291 B.R. at 792 (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993)).

# A

In summary, a determination of nondischargeability under § 523(a)(2)(B) requires proof that the Plaintiff loaned money after it reasonably relied upon false financial documents concerning the Debtor and/or an insider, provided to it by the Debtor either directly or indirectly, and that the Debtor intended to deceive the Plaintiff when doing so. *Copeland*, 291 B.R. at 780 (quoting 4 COLLIER ON BANKRUPTCY ¶ 523.08[2] (Lawrence P. King ed., 15th ed. rev. 2002)). Unless the Plaintiff can satisfy all of the criteria set forth in the statue, the court cannot make a finding of nondischargeability. *See* 11 U.S.C.A. § 523(a)(2)(B).

Any document, whether or not the Debtor actually prepared it, will satisfy the writing requirement. *Union Planters Bank, N.A. v. Martin (In re Martin)*, 299 B.R. 234, 239 (Bankr. C.D. Ill. 2003); *Copeland*, 291 B.R. at 782. Nevertheless, it is also required that the Debtor either created the false statements, had the statements created, or allowed the statements to be "published," i.e., made public or circulated. *Copeland*, 291 B.R. at 785. Additionally, this section applies to documents obtained from another source but authorized by the Debtor, as well as any documents personally supplied to the Plaintiff by the Debtor himself. *Copeland*, 291 B.R. at 785. In this case, the documents at issue are the Financial Documentation submitted to the Plaintiff by Retail Management during its initial loan application process between May and October 2003.

Additionally, the documents at issue must contain materially false statements offering "a substantially untruthful picture" of the financial condition of the Debtor or an insider[6] that

---

[6] The Bankruptcy Code provides the following definition of an insider relative to this adversary proceeding:
(continued...)

significantly affected the Plaintiff's decision to make the loans. *Copeland*, 291 B.R. at 782. "[A] statement is materially false if it 'contains an important or substantial untruth. The measuring stick of material falsity is whether the [creditor] would have made the loan if the [company's] true financial condition had been known.'" *Copeland*, 291 B.R. at 782 (quoting *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001)). Moreover, the concealing or understating of assets or liabilities is considered a material misstatement, *Copeland*, 291 B.R. at 782, and "writings containing pertinent omissions may qualify as 'materially false' for purposes of a section 523(a)(2)(B) violation." *European Am. Bank v. Launzel-Pennes (In re Launzel-Pennes)*, 191 B.R. 6, 11 (Bankr. E.D.N.Y. 1996); *see also Martin*, 299 B.R. at 240.

The Plaintiff must also prove that it reasonably relied on the documents furnished by Retail Management. "[A]s a threshold the creditor must establish that it actually relied on the written statement prior to taking action, compared to situations where the creditor is persuaded by other factors, such as the debtor's reputation and enthusiasm for the project." *Carson v. Chamberlain (In re Chamberlain)*, 330 B.R. 195, 204 (Bankr. S.D. Ohio 2005). In making this determination, the court should consider a totality of the circumstances of each case, but primarily question "whether

---

[6](...continued)
(A) if the debtor is an individual—

    (i) relative of the debtor or of a general partner of the debtor;

    (ii) partnership in which the debtor is a general partner;

    (iii) general partner of the debtor; or

    (iv) corporation of which the debtor is a director, officer, or person in control[.]

11 U.S.C.A. § 101(31) (West 2004). Clearly, Retail Management is an insider of the Debtor, who is its one-half owner and its Secretary.

there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Copeland*, 291 B.R. at 785 (quoting *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993)). "While . . . the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors, such a precaution could be the ordinarily prudent choice[.]" *Shaw Steel, Inc. v. Morris (In re Morris)*, 223 F.3d 548, 554 (7th Cir. 2000).

Intent to deceive can be inferred through the Debtor's actions and includes a reckless disregard for the truth of the financial documents furnished to the Plaintiff. *Copeland*, 291 B.R. at 786. Intent is established if the Debtor personally submitted or allowed to be submitted financial documents that he knew were untrue, even without a subjective intent to deceive. *Copeland*, 291 B.R. at 786 (citing *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90 (6th Cir. 1993)). Similarly, "'[r]eckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent [to deceive].'" *Copeland*, 291 B.R. at 786 (quoting *Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 30 n.12 (5th Cir. 1995)).

**B**

There is no real dispute as to several elements. First, the Debtor and his company, Retail Management, obtained $350,000.00 from the Plaintiff, of which $82,319.75 has not been repaid.

10

Second, there is no dispute that the documents supplied to the Plaintiff during the loan application process were financial records of an insider of the Debtor, namely, Retail Management. Third, the Financial Documentation clearly constitutes a writing published by the Debtor. Even though the testimony at trial evidenced that it was Mr. Jones, and not the Debtor, who primarily forwarded the Financial Documentation to Mr. Johnson, the release of those documents to the Plaintiff in order to obtain the loan was nevertheless authorized by the Debtor, as was the content thereof.

Therefore, the only elements truly at issue are (1) whether the Debtor allowed false documentation to be supplied to the Plaintiff; (2) if so, whether he did so with the fraudulent intent of inducing the Plaintiff to make the loan; and (3) whether the Plaintiff reasonably relied upon the false documentation in making the loan. The Plaintiff's argument with respect to the false documents element centers primarily around its assertion that the Financial Documentation did not evidence, and the Debtor did not disclose, that Retail Management was not making timely rent payments pursuant to the lease with Ramco, even though the Debtor knew that payments were not current. The Plaintiff maintains that these actions evidence the Debtor's intent to deceive, or at the very least, his reckless indifference to the truth. Finally, the Plaintiff argues that it reasonably relied upon the materially false documentation and omissions, such that it would not have made the loan to Retail Management if it had known that rent payments to Ramco were not current.

In the prosecution of its case, the Plaintiff relies upon many financial documents of Retail Management, including the Financial Documentation, which were not disputed by the Debtor as being supplied to the Plaintiff during the loan application process. Through Ms. Warrington's testimony, the Plaintiff introduced additional documents concerning Retail Management's financial

condition, which were located in the Plaintiff's file. Included among those documents are three documents that Ms. Warrington testified were part of Retail Management's loan application: (1) a Debt Summary dated September 25, 2003, which lists all of Retail Management's accounts payable, followed by the Plaintiff's internal documents entitled "Debt Service Ratios," which also contains Application Comments dated August 20, 2003, made by Mr. Johnson; (2) the Income Statement for the Ten Months Ending October 31, 2003 for Retail Management, evidencing a negative net operating income of $35,019.64 for October and negative $301,784.56 for the year-to-date; and (3) the Financial Statements dated December 31, 2003 for the Clinton Highway Store compiled by J. Roland Shankles, CPA, evidencing the company's net losses of $273,197.99 for 2003. COLL. TRIAL EX. 19; TRIAL EX. 16; TRIAL EX. 21.

Ms. Warrington also identified five documents that she obtained from the Clinton Highway Store after the Plaintiff took possession in June 2004, reflecting the financial condition for both Retail Management and Venture Capital: (1) Venture Capital's Income Statement for the Ten Months Ending October 31, 2003; (2) Daily Cash Activity printouts for Retail Management and Venture Capital for November 17, 2003, November 18, 2003, and November 20, 2003; (3) Retail Management's Outstanding Checks as of November 30, 2003, printed on November 18, 2003, and November 19, 2003; (4) Vendor Ledgers for the Period from Jan. 1, 2003, to Dec. 31, 2004, for Retail Management and Venture Capital; and (5) a fax addressed to the Debtor from The CIT Group's Legal Department concerning Retail Management's past due invoices totaling $60,259.96. TRIAL EX. 15; TRIAL EX. 17; TRIAL EX. 18; TRIAL EX. 23; TRIAL EX. 25.

The Plaintiff supplemented its proof with respect to these documents through the testimony of Mr. Johnson, who was the actual loan officer involved in making and servicing Retail Management's loan. During his testimony, Mr. Johnson also identified the Financial Documentation as being provided by Retail Management prior to and during the loan application process. With respect to Trial Exhibit 16, Mr. Johnson could not recall whether he had received it during the loan application process, but he stated that it was a document that he would have been interested in. With respect to Trial Exhibit 21, Mr. Johnson testified that he routinely requested financial statements from his customers at the end of each year, and Retail Management would have provided him with this document pursuant to that review. Finally, with respect to Collective Trial Exhibit 19, Mr. Johnson testified that Retail Management supplied the Debt Summary spreadsheet during the loan application process, but the "Debt Service Ratios" document was not created and supplied by Retail Management, but instead, was prepared by the Plaintiff.

Having reviewed these documents, the court cannot conclude that they contain any false information that would have induced the Plaintiff into making the loan to Retail Management. The only documents that the Plaintiff could have had during the loan application process are the Financial Documentation and the Debt Summary portion of Collective Trial Exhibit 19. Clearly, documents that were created and are based upon events occurring after October 20, 2003, the date upon which the SBA approved Retail Management's application, could not have formed the basis upon which the Plaintiff loaned Retail Management money, and therefore, Trial Exhibits 16 and 21, which Ms. Warrington testified were part of the loan application package, could not have been.

The evidence reflects that Retail Management made its monthly rental payments to Ramco through October 2003. Based upon the Outstanding Checks report dated November 30, 2003, and marked as Trial Exhibit 18, check number 1853 dated August 4, 2003, payable to Ramco Properties in the amount of $26,775.00, was written but had not cleared Retail Management's account. *See* TRIAL EX. 18. And, although Trial Exhibit 17, the Daily Cash Activity Report for the Day Ended November 17, 2003, which the Plaintiff obtained after it took possession of the Clinton Highway Store, contains an entry stating "Needed Next Week . . . Rent - Sep, Oct not written" TRIAL EX. 17, the Income Statement for the twelve months ending December 31, 2003, prepared by J. Roland Shankles, CPA, which is marked as Trial Exhibit 21, reflects actual operating expenses for the year, including $214,200.00 for rent, which translates to eight months at $26,775.00 per month.[7] Accordingly, based upon the evidence presented at trial, at the time that Retail Management was obtaining the loan, and including the month that its loan was approved by SBA, it was current on its rental obligations, and therefore, the Debtor did not submit false information to obtain the loan.

Furthermore, the actual documents submitted during the loan application process, i.e., the Financial Documentation, consisting of Trial Exhibits 12, 13, 14, and 20, reflect Retail Management's financial transactions for May and June 2003, during which time, the rent payments were current. Additionally, the fact that the Debt Summary portion of Collective Trial Exhibit 19 does not include any mention of Ramco is of no particular significance because a comparison of this document to others evidences that none of the monthly expenses listed in the Income Statements, such as rent or utilities, are included on the Debt Summary. *Compare* COLL. TRIAL EX. 19 *with*

---

[7] Per the Sublease with Venture Capital, Retail Management became responsible for the rental payments beginning in March 2003. *See* TRIAL EX. 9.

TRIAL EX. 12. It appears that the Debt Summary consists entirely of vendors, and thus, the rent would not be listed thereon.

Moreover, and more significantly, the evidence does not support the Plaintiff's contention that it reasonably relied upon the Financial Documentation to make the loan to Retail Management. At trial, Mr. Johnson testified that he personally reviewed the Financial Documentation and that the Plaintiff relied upon the documents when making the loan to Retail Management. He stated that at the time the Plaintiff made the loan, neither he nor the Plaintiff was aware that the rent to Ramco was not current, however, had they known, the loan would not have been approved. Additionally, Mr. Johnson testified that even with the SBA approval, he still could have stopped the Plaintiff from making the loan, and he would have done so had he been informed that the rent was past due. On the other side, however, Mr. Johnson acknowledged that he did not specifically ask if Retail Management was current on its rent to Ramco.

It is somewhat disingenuous for the Plaintiff to argue that it made the loan based upon the contents of the Financial Documentation. Each of these documents clearly evidences a company in dire financial straits, irrespective of whether rent payments were current or delinquent. First, the Income Statement marked as Trial Exhibit 12 evidences that, as of May 31, 2003, Retail Management had a year-to-date negative net operating income of $123,721.34, and a negative net operating income for the month of May of $26,043.69. TRIAL EX. 12. Second, the Balance Sheet marked as Trial Exhibit 13 evidences that on May 31, 2003, Retail Management's total assets were $655,486.59, compared to its total liabilities of $629,166.78, leaving a net worth of only $26,319.81. TRIAL EX. 13. Third, the Income Statement marked as Trial Exhibit 14 evidences that Retail

15

Management had a negative net operating income for June 2003 of $25,923.11, and that its year-to-date negative net operating income had grown to $149,644.45. TRIAL EX. 14. Finally, the May 31, 2003 Assumptions for Forecast marked as Trial Exhibit 20 expressly states the following in the first paragraph, entitled "Note A - Nature of Forecast":

> This forecast is based upon income being earned from the sale of Retail Sporting goods and present to the best of management's knowledge and belief, the projected revenue, operating costs, cash flow and debt service coverage if the accompanying assumptions are met. Accordingly, this forecast reflects management's judgment as of May 31, 2003, regarding the expected conditions and the expected course of action if the assumptions contained herein are met. This forecast is prepared for the sole purpose of analyzing the forecasted income, expenses and debt service coverage and should not be used for any other purpose. This forecast is not intended to present a full financial presentation under generally accepted accounting principles, which would require full financial forecasts, and other disclosures, which may or may not be pertinent to the forecast presented. Accordingly, the scope of this forecast is limited and should not be used by those who are unfamiliar with such inherent limitations. The assumptions disclosed herein are those which management believes are significant to the accuracy of the forecast. Furthermore, even if the income levels are attained, there will usually be differences between the forecasted and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

TRIAL EX. 20. This document then lists the company's assets, liabilities, equity investment, general administrative expenses including the rental payments to Ramco, and its projected income, which is "based upon managements knowledge of the retail market and customer service for the sporting goods industry[, and] . . . initial sales for the first 2.5 months of operations of $273,000 is biased for the strong summer, fall and Christmas seasons based upon known levels of sales of similar stores, and is therefore annualized to a 12 month level of $2,750,000 accordingly." TRIAL EX. 20.

The Plaintiff's own internal comments, as evidenced by the "Debt Service Ratios" portion of Collective Trial Exhibit 19, state as follows:

> On Wednesday, August 20, 2003 5:31 PM, k76045 wrote:

16

> They actually want $350,000 but I had already chosen the Low Doc loan type since it appeared no different from the SBA 7a. I was not going to do this over. So do as you must.
>
> On Wednesday, August 20, 2003 5:20 PM, k76045 wrote:
> The collateral description was left blank because I know you will tell me what is required in order to secure the loan if approved. See the financial statements for listings of assets.
>
> On Wednesday, August 20, 2003 5:18 PM, k76045 wrote:
> SBA Loan Request. The other 2% of the business is owned by Venture Capital Resources. Ralph Johnson has given me guidance on this loan as to documentation.

COLL. TRIAL EX. 19.[8] At trial, Mr. Johnson explained that a low document loan type was created by the SBA to make the process shorter and is one approved primarily because of the collateral and guarantees pledged.

The next page of this document, entitled Financial Summary, was also prepared by the Plaintiff and states, in material part, as follows:

> Statement Date            05/31/03
>
> . . . .
>
> Total Assets              $655,485
> Total Liabilities         $629,166
> Net Worth                  $26,319
> Debt to Net Worth            23.91

COLL. TRIAL EX. 19. Upon cross examination at trial, Mr. Johnson stated that he personally reviewed all of the documents that he submitted to the SBA prior to doing so, and he acknowledged that Retail Management had a net worth of only $26,319.00 at that time.

---

[8] At trial, Donny Johnson testified that he made these entries.

17

Based upon the evidence presented by way of the documents and Mr. Johnson's testimony, it appears to the court that the Plaintiff primarily relied upon the SBA approval to guarantee Retail Management's loan, rather than upon the representations contained in the Financial Documentation, when it made the $350,000.00 loan to Retail Management. The financial documents themselves paint a picture of a company that was clearly struggling financially. The Income Statements show that the Clinton Highway Store had a gross profit, for the year-to-date as of June 30, 2003, of $132,079.02, compared to total expenses of $281,723.47, resulting in a negative net operating income of $149,644.45. Rent and payroll represented Retail Management's largest regular monthly expenses, averaging $26,775.00 and $21,950.63 per month, respectively.[9] *See* TRIAL EX. 12; TRIAL EX. 14. Additionally, the Assumptions Forecast is somewhat generic, and it appears to truthfully represent that the Debtor and Mr. Jones had no real basis for those assumptions other than pure speculation. *See* TRIAL EX. 20.

Furthermore, a primary purpose for obtaining the $350,000.00 loan from the Plaintiff was to assist Retail Management pay its outstanding payables. The Debt Summary lists outstanding vendor payables due, as of September 25, 2003, in the amount of $318,262.03. COLL. TRIAL EX. 19. Of this amount, $94,578.04 was between one and ninety days past due, and both the Debtor and Mr. Jones testified that, at the time the loan was made, Retail Management had not paid all of its vendors, so it needed assistance paying bills and purchasing additional inventory. *See* COLL. TRIAL

---

[9] Pursuant to the Sublease with Venture Capital, Retail Management began its operations at the Clinton Highway Store in March 2003, and therefore, these averages are based upon the four months of operation between March and June 2003. *See also* TRIAL EX. 16 (reflecting the figures through October 31, 2003); TRIAL EX. 21 (reflecting the figures through December 31, 2003).

Ex. 19. For those reasons, Retail Management, through the Debtor and Mr. Jones, contacted the Plaintiff about the loan.

Finally, Mr. Johnson testified that, originally, the Plaintiff internally disapproved Retail Management's loan application without a SBA guarantee, a fact that was unknown to both the Debtor and Mr. Jones. The Debtor and Mr. Jones testified that it was their belief that it was necessary to obtain the SBA guarantee because theirs was a start-up business. However, in light of the Plaintiff's initial decision not to approve the loan without the SBA guarantee, it seems obvious that the Plaintiff's subsequent decision to make the loan was based exclusively upon the SBA guarantee. The court can reach no other conclusion when considering the financial information contained in the documentation provided by Retail Management during the loan application process, both initially and in connection with obtaining the SBA guarantee, which reflected negative net operating income.

Based upon the foregoing evidence, the court finds that the Debtor did not publish or cause to be published false documentation respecting Retail Management's financial condition, that there was no fraud in the inducement by the Debtor during the loan application process, and that the Plaintiff did not reasonably rely upon the Financial Documentation when it approved Retail Management's loan. There is accordingly no fraud upon which a determination of nondischargeability can be based. Because the Plaintiff has not met its burden of proof under § 523(a)(2)(B), it is not entitled to a nondischargeable judgment against the Debtor.

A judgment consistent with this Memorandum will be entered.

FILED:  December 21, 2005

> BY THE COURT
>
> */s/ RICHARD STAIR, JR.*
>
> RICHARD STAIR, JR.
> UNITED STATES BANKRUPTCY JUDGE